IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 05-00029-02-CR-W-HFS |
| CARLOS BRANDON, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Before the Court is defendant's motion to suppress evidence on the grounds that the evidence was obtained during an unlawful pursuit, arrest, and search of defendant's person and vehicle, conducted without probable cause or reasonable suspicion and without any warrant.

## *I. BACKGROUND*

On September 29, 2004, officers of the Kansas City, Missouri Police Department were conducting surveillance on a residence in preparation for the execution of a search warrant on that residence. Probable cause for that search warrant arose from the observation of drug transactions and undercover buys conducted at the residence. Prior to the execution of the search warrant, the officer maintaining surveillance observed a white SUV arrive at the residence. Two individuals, later identified as defendant Carlos Brandon and co-defendant William Carter, exited the SUV and entered the residence. Moments later, Brandon and Carter exited the residence, re-entered the SUV, and drove away from the residence.

Officer Claussen recognized the individuals' conduct as characteristic of a drug transaction and similar to transactions previously observed at the residence. He directed the perimeter team to

stop the vehicle, describing the vehicle, the occupants, and the direction of travel. Sergeant Charles Huth had been assigned to provide perimeter support to the execution of the search warrant. He observed the vehicle described by Officer Claussen as it reached the end of the street where the residence was located. The vehicle turned and approached Sgt. Huth's location. As the vehicle passed him, Sgt. Huth pulled behind the vehicle in a marked police car and attempted to initiate a car stop.

As Sgt. Huth activated his emergency equipment, the vehicle fled at a high rate of speed. Sgt. Huth pursued the vehicle through residential streets as the driver engaged in numerous evasive maneuvers, disregarded traffic signs, and lost control of the vehicle at least once, striking a road sign. The SUV eventually turned onto an alleyway that was blocked by large truck. Both subjects jumped out of the SUV and fled on foot. Sgt. Huth engaged in a foot chase, following the defendant for several blocks. He observed the defendant produce and discard two firearms. Defendant continued to reach in his pants as he ran, disregarding Sgt. Huth's orders to stop. Sgt. Huth eventually subdued defendant by shooting him in the back with two tazer probes. Defendant continued to reach in his pants and did not comply with Sgt. Huth's instructions to put his hands behind his back. Sgt. Huth tazed defendant again, then held him on the ground until other officers arrived to assist in handcuffing him. Sgt. Huth informed the other officers that the defendant might be armed and that he kept reaching into his waistband. One officer searched defendant's person and felt a large bulge in defendant's left front pocket. A search of that pocket recovered numerous plastic baggies of crack cocaine.

Subsequent to defendant's arrest, a crime scene technician recovered an assault rifle and a hand gun discarded by the defendant during the foot chase. A search warrant was obtained and

executed on the SUV prior to towing. The search of the SUV recovered plastic baggies of crack cocaine, a cell phone, and a driver's license with Carlos Brandon's name and photo. A computer check of the SUV revealed that the vehicle was registered to defendant's mother.

A criminal complaint was filed on September 30, 2004, charging defendant with possession with intent to distribute crack cocaine. On October 29, 2004, an indictment was returned charging defendant with possession with intent to distribute crack cocaine and illegal possession of a firearm. On January 27, 2005, defendant was re-indicted by a federal grand jury on charges of conspiracy to distribute and possess with intent to distribute cocaine base, as well as other drug and weapons violations. Defendant filed a motion to suppress evidence and statements on May 13, 2005. On June 6, 2005, I conducted an evidentiary hearing on this motion. The government appeared by Assistant United States Attorneys P.J. O'Connor and Gregg Coonrod. The defendant was present, represented by appointed counsel Bruce Houdek. The government called Kansas City Missouri Police Officer Darla Harris of the Gang Squad, and Kansas City Missouri Police Sergeant Charles Huth of the Narcotics Unit to testify. In addition, the following exhibits were marked and admitted into evidence:

Government's Exhibit 1: Affidavit and Application for Search Warrant
Government's Exhibit 2: KCMO Police Department Inventory Report
Government's Exhibit 3: Video Tape of Dash Video

## ***II. EVIDENCE***

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. Sometime between September 14, 2004, and September 29, 2004, Officer Darla Harris of the Kansas City, Missouri Police Department made contact with a residence

on Forest Street in Kansas City, Missouri. (Tr. at 6-7.) Officer Harris was assigned to the Gang Squad, and had been in law enforcement for about ten and a half years. (Tr. at 6.) She had been involved in hundreds of drug-related investigations. (Tr. at 6.) Officer Harris's purpose in going to the Forest Street residence was to locate a victim of an alleged shooting at another residence. (Tr. at 7.) When Officer Harris drove by the Forest Street residence, she was alone. (Tr. at 7.) As she passed the residence, an individual in front of the residence flagged Officer Harris with a signal commonly used to solicit the purchase of narcotics. (Tr. at 7, 8.) Officer Harris left the area to find someone to be her partner. (Tr. at 8.) When they returned to the residence, they interrupted a narcotics transaction in the street. (Tr. at 8.) Officer Harris and her partner set up surveillance and observed narcotics transactions taking place between parties from the house selling to people in cars. (Tr. at 8-9.) Officer Harris was able to recognize the behavior she observed as narcotics transactions because she worked undercover purchasing narcotics for two years. (Tr. at 9.)

2. Officer Harris determined the best approach to take with the Forest Street residence was to get a purchase from the residence. (Tr. at 9.) Using a confidential information, she and other officers arranged a successful controlled buy from the residence. (Tr. at 9.) Officer Harris conducted surveillance on the residence for two days. (Tr. at 9.) In those two days, she observed an unusual number of people in the front yard of the residence, entering and exiting the residence. (Tr. at 10.) She also observed an unusual amount of vehicle traffic in which cars would pull up and stop, stay for a short moment after people at the residence contacted them, and then leave. (Tr. at

10.) Officer Harris also observed lookouts on the block, which are people commonly used to notify the people in the residence if police are in the area. (Tr. at 10.)

3. Based on the activity observed at the residence, officers obtained a search warrant for the residence. (Tr. at 10.) The search warrant was executed on September 29, 2005. (Tr. at 10.)

4. Sergeant Chip Huth was an officer involved in the execution of that warrant, and he was present at the pre-execution briefing. (Tr. at 10-11.) Officer Clausen was assigned to maintain surveillance on the residence prior to the execution of the warrant. (Tr. at 11.)

5. On September 29, as the Tactical team was moving into the area to begin execution of the search warrant, Officer Clausen radioed information to everyone involved in the search warrant, reporting that he had observed a white SUV pull up to the residence and stop. (Tr. at 11.) The driver and the passenger exited the vehicle. (Tr. at 11.) Both were black males. (Tr. at 11.) Both subjects entered the residence and then came back out, got into the vehicle, and left. (Tr. at 11-12.) Officer Harris and other officers requested that the vehicle be stopped. (Tr. at 12.) In Officer Harris's experience, anytime a vehicle stays for a short amount of time at a residence that is a known narcotics house, a reasonable person could believe they were participating in narcotics activity. (Tr. at 12.) The behavior of the SUV driver and passenger were consistent with the activity previously observed at the Forest Street residence. (Tr. at 13.) The officers wanted to have the vehicle stopped after it left the immediate vicinity of the residence. (Tr. at 13-14.)

6. Sergeant Charles Huth was a day-shift supervisor in the Central Patrol Division of the Kansas City, Missouri Police Department. (Tr. at 34.) On September 29, 2004, he attended the search warrant briefing for the Forrest Street residence. (Tr. at 35.) Sergeant Huth was assigned to bring a support element to the search warrant execution to provide perimeter security on the streets surrounding the residence. (Tr. at 35.) The purpose of this perimeter support was to catch anyone running from the residence during the execution of the search warrant. (Tr. at 35.) Sergeant Huth stationed himself a short distance from the residence on Troost Avenue. (Tr. at 35.) Other units were stationed on other streets surrounding the area. (Tr. at 35.) Sergeant Huth heard the information relayed via the radio regarding the white SUV leaving the front of the residence. (Tr. at 36.) He heard the request to have the vehicle stopped, that it was wanted in regards to the investigation of the drug house. (Tr. at 36.) A description of the vehicle and its occupants was provided, as well as the direction of travel. (Tr. at 36.) From his position on Troost Avenue, Sergeant Huth could see the vehicle when it turned off of Forest Street. (Tr. at 36.) It was coming away from the residence, and it was the only vehicle on the street. (Tr. at 36.)

7. Sergeant Huth allowed the vehicle to pass in front of him as it crossed Troost Avenue. (Tr. at 37.) He then pulled behind the vehicle and activated his emergency lights and in-car video camera. (Tr. at 37.) Once Sergeant Huth initiated the traffic stop, Officer Satter radioed additional information that the vehicle was allegedly involved in a homicide. (Tr. at 14, 27-28, 37.) When Sergeant Huth activated his lights, the vehicle stopped in the roadway, positioned to turn south on a cross-street

one block west of Troost Avenue. (Tr. at 37.) The driver attempted to turn in front of on-coming traffic to cut off Sergeant Huth's pursuit. (Tr. at 37.) Sergeant Huth remained with the vehicle and cut in front of the on-coming traffic. (Tr. at 37-38.) The SUV accelerated to approximately 70-80 miles per hour, traveling southbound on the residential street. (Tr. at 38; Gov't Ex. 3.) The vehicle ignored stop signs all the way down the street. (Tr. at 38.) The vehicle made two more turns in an attempt to evade Sergeant Huff's pursuit. (Tr. at 38; Gov't Ex. 3.) In attempting a third turn, the vehicle went off the road and struck a one-way sign. (Tr. at 38.) It then turned down an alleyway between two streets, traveling down the alley at approximately 50-60 miles per hour. (Tr. at 38; Gov't Ex. 3.) The vehicle did not slow down at cross streets. (Tr. at 38.) The vehicle eventually came to a stop when it encountered a large truck or material handler blocking the alley. (Tr. at 39.)

8. Before the vehicle came to a full stop, the defendant jumped out of the passenger side of the vehicle. (Tr. at 40.) The defendant and the driver both fled on foot. (Tr. at 40.) As the defendant jumped out of the vehicle, he threw a rifle to the ground. (Tr. at 40.) As he started to run, he tosses what Sergeant Huft believed to be a hand gun to the ground. (Tr. at 40.)

9. Sergeant Huft parked his car, drew his gun, and exited his vehicle. (Tr. at 40.) As he exited his vehicle, he saw the driver crossing the next street down. (Tr. at 40.) He did not know whether anyone else was in the vehicle, so as he ran by the car he did a quick check to clear the vehicle for other passengers. (Tr. at 40-41.) Sergeant Huft then pursued the defendant and the driver on foot as they ran southbound through the

alley. (Tr. at 41.) Sergeant Huft never lost sight of the defendant and the driver as they went around the material handler in the alley. (Tr. at 41.)

10. Some homicide detectives arrived at the scene just as the defendant and the driver ran past their car. (Tr. at 41.) One of the detectives jumped out and Sergeant Huft asked if he had the driver. (Tr. at 42.) The detective acknowledged that he would take the driver. (Tr. at 42.) The driver and the defendant split up, and Sergeant Huft followed the defendant. (Tr. at 42.) He chased the defendant approximately three blocks, telling the defendant to drop what he had, show his hands, and get on the ground. (Tr. at 42.) The defendant disregarded these commands. (Tr. at 42.) At one point, the defendant looked back at Sergeant Huft and stopped running for several seconds. (Tr. at 42.) The defendant was reaching in the waistband of his pants. (Tr. at 42.) He continued to flee after this brief stalemate. (Tr. at 41-42.)

11. When he started running again, defendant pulled his hands out of his pants where Sergeant Huft could see them. (Tr. at 43.) Sergeant Huft took that opportunity to holster his firearm and drew his Tazer X-26 from its holster. (Tr. at 43.) Sergeant Huft then fired the Tazer and struck the defendant in the back with both prongs. (Tr. at 43.) The defendant fell to the ground and lay prone as the Tazer went through its five-second cycle. (Tr. at 44.) As soon as the cycle completed, defendant reached under his body. (Tr. at 44.) Sergeant Huft told defendant to show his hands, and defendant disregarded the command. (Tr. at 44.) Sergeant Huft hit defendant with the Tazer again, and defendant pulled his hands out. (Tr. at 44.) Sergeant Huft shut the Tazer off as two officers ran up to assist him. (Tr. at 44.) The two officers had to

control the defendant, who still was not cooperating. (Tr. at 44.) They get the defendant into a high-risk hold and place handcuffs on him. (Tr. at 45.) Sergeant Huft removed the Tazer probed from defendant's back and began cleaning them. (Tr. at 45.) He informed the two officers that the defendant had been reaching for something and that he had already thrown a gun. (Tr. at 45.) The officers then began patting down the defendant. (Tr. at 45.) They found a large amount of cocaine on his person, as well as U.S. currency, a driver's license, and a cellular phone. (Tr. at 18, 45.) The Gang Squad detectives responded to the scene and defendant was released to their custody. (Tr. at 55.)

12. Officer Harris arrived on the scene after defendant had been searched. (Tr. at 18.) The officers released the property recovered to Officer Harris as evidence. (Tr. at 18.) Officer Harris went back to where the SUV had been stopped in the alleyway. (Tr. at 18-19.) There she observed a long gun and a small gun that Sergeant Huth had said defendant had tossed. (Tr. at 19.) Both guns were located just west of the vehicle, as though they had been tossed. (Tr. at 21.) The guns were later recovered by Crime Scene Technician Melani Bartch because it was unknown whether the guns had been used in a homicide or some kind of assault. (Tr. at 21.)

13. Officer Harris conducted an inventory search of the SUV limited to a search for other parties that might be hiding inside the vehicle. (Tr. at 19-20.) She looked underneath some boxes stowed in the back of the vehicle. (Tr. at 20.) The vehicle was then towed, and she obtained a search warrant for the vehicle. (Tr. at 20.) Officer Harris searched the vehicle pursuant to that warrant and recovered crack cocaine from the

ashtray, other drug paraphernalia, paperwork belonging to the defendant and to the defendant's mother, a cell phone, and a photograph of black makes using gang signs with their hands. (Tr. at 20-21.)

## *III. LEGAL ANALYSIS*

Defendant argues that the officers in this case did not have sufficient evidence to justify a Terry stop of defendant's vehicle. He argues that no officer saw the defendant or the driver engage in any criminal activity, and the officers had no information regarding the identity of the occupants of the vehicle, no warrants or pickup orders for the occupants or the vehicle, no license plate identification of the vehicle, and no claim of any traffic violation. Defendant further states that the officer radioing information regarding the vehicle made inaccurate and confusing statements as to its manufacturer. Defendant states that the stop by Sergeant Huth was clearly a pretextual stop to search anyone going to and from the residence. He argues that Sergeant Huth initiated an illegal stop when he turned on his emergency lights without reasonable suspicion of criminal activity. The government responds that law enforcement officers possessed probable cause and reasonable suspicion to stop the SUV and its occupants, that the officer possessed probable cause to stop and arrest defendant, that the cocaine seized from defendant's person and from the vehicle were lawfully obtained because the searches were conducted for officer safety and incident to arrest, and that officers possessed probable cause to search the vehicle before and after a search warrant was obtained.

The key issue in deciding defendant's suppression motion is whether Sergeant Huth had reasonable suspicion to initiate the car stop of the vehicle in which defendant was a passenger. Defendant's argument is based on his premise that there was no reasonable suspicion or probable

cause to justify initiating a car stop and thus triggering the vehicular and foot chase leading up to defendant's arrest.

> Law enforcement officers may make an investigatory stop if they have a reasonable and articulable suspicion of criminal activity. A reasonable suspicion is a particularized and objective basis for suspecting the person who is stopped. Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances. In short, the government must point to specific, articulable facts that reasonably suggest a crime.

*United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (internal citations omitted); *see also Terry v. Ohio*, 392 U.S. 1, 25-31 (1968). "In deciding whether to conduct a *Terry* stop, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." *United States v. Thomas*, 249 F.3d 725, 728 (8th Cir. 2001). In a case involving occupants of a vehicle engaging in brief contact with occupants of a residence notorious for drug traffic, an officer may reasonably infer that the vehicle's occupants are engaging in a drug transaction when their presence at the residence is preceded by several, or even one drug buy observed by police. *See Bustos-Torres*, 396 F.3d at 942-43. This inference may be made even when the officer is unable to see the illegal activity taking place. *Id.*

Defendant argues that, because he and the driver of the SUV were inside the Forrest Street residence and no illegal activity was observed by the police, Sergeant Huft had no reasonable suspicion of criminal conduct to support the attempted stop and subsequent pursuit of the SUV and its occupants. Sergeant Huft and Officer Harris were able to articulate a reasonable basis for suspecting the defendant and the driver of illegal activity, however. They testified that multiple drug transactions had been observed over the course of at least two days at the residence, all following the pattern exemplified by the defendant and co-defendant: the vehicle stopped, the occupants stayed

for a short time after making contact with the people at the residence, and then they exited the residence and departed. Based on her prior observations at the residence and her extensive experience with drug-related investigations, Officer Harris recognized this conduct as indicative of a drug transaction, and so requested that the vehicle be stopped. Sergeant Huft made visual contact with the vehicle as it was leaving Forrest Street and so reasonably concluded that it was the vehicle the investigatory team wished to have stopped. These circumstances gave rise to reasonable suspicion to support an investigatory stop of the vehicle.

Once Sergeant Huft initiated the stop, the driver of the vehicle fled and took evasive action, committing multiple traffic violations and endangering the lives of Sergeant Huft, other motorists, and bystanders in the immediate vicinity. This conduct gave rise to probable cause to arrest the defendant and the driver of the SUV for violations of the law committed in the presence of Sergeant Huft. Moreover, defendant's conduct in fleeing on foot from Sergeant Huft, including discarding two firearms and continuing to reach inside the waistband of his pants after being ordered to stop, gave rise to a reasonable fear for officer safety to support a search of his person.

The circumstances of defendant's arrest and the gathering of evidence in this case conform to the letter and spirit of the law. I can find no basis to support defendant's motion to suppress the evidence recovered from his person or from the vehicle, which was searched pursuant to a valid search warrant.

For the above stated reasons, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence and statements.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date

of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 28, 2005